IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BERNARD S. ORANIKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 04 C 8113 |
| v. | ) |
| | ) Hon. Mark Filip |
| CITY OF CHICAGO, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Mr. Bernard Oranika ("Mr. Oranika" or "Plaintiff"), has sued the City of Chicago

("Defendant" or "the City") for alleged employment discrimination. This case is before the

Court on Defendant's motion for summary judgment. (D.E. 60.)[1] As explained below, the

City's motion is granted and the case is dismissed.

### RELEVANT FACTS

The recitation of facts set forth herein is based on application of the principles set forth in

Local Rule 56.1 (which was formerly known as Local Rule 12M) and well-settled caselaw

concerning those local rules. As explained below, Local Rule 56.1 governs the presentation and

adjudication of summary judgment motions, and it is designed to promote fair and efficient

treatment of such motions. *See, e.g., Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th

Cir. 1995).

I.      Local Rule 56.1

Local Rule 56.1 requires that statements of facts concerning summary judgment motions

must contain allegations of material fact, and the factual allegations must be supported by

---

[1] The various docket entries are cited as "D.E. __."

admissible record evidence. *See, e.g.,* L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85

(N.D. Ill. 2000) (Castillo, J.). While this Court is generally solicitous of *pro se* plaintiffs

confronting the procedural requirements of litigation, precedent teaches that a *pro se* litigant is

not exempt from meaningfully complying with L.R. 56.1 or provided immunity from the

requirements of that Rule. *See, e.g., Greer v. Bd. of Educ. of the City of Chicago,* 267 F.3d 723,

727 (7th Cir. 2001); *Stevens v. Navistar Int'l Transp. Corp.,* 244 F. Supp. 2d 906, 910 (N.D. Ill.

2002) (St. Eve, J.) (collecting cases); *accord, e.g., Members v. Paige,* 140 F.3d 699, 702 (7th Cir.

1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). The

Seventh Circuit has instructed that a district court has broad discretion to require strict

compliance with L.R. 56.1. *See Midwest Imports,* 71 F.3d at 1316 (collecting cases and stating,

"[w]e have consistently and repeatedly required strict compliance"); *accord, e.g., Koszola v. Bd.

of Ed. of City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004) (collecting cases); *Curran v.

Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (collecting cases).

In this case, Mr. Oranika was repeatedly informed that specific rules applied in this case

concerning summary judgment adjudication. For example, when the City filed its summary

judgment motion, it provided Mr. Oranika with express written notice of applicable rules,

including the local rules, that needed to be followed. (D.E. 63.) In addition, the Court earlier

had specifically advised Mr. Oranika in open court of the rules that governed summary judgment

adjudication, and the Court told Mr. Oranika that he should please review such rules carefully.

(Hearing Transcript of November 15, 2005.[2])

Notwithstanding such notices, Mr. Oranika has failed to comply with the requirements of

Local Rule 56.1 in numerous material respects. For example, Mr. Oranika has improperly

---

[2] The Court has reviewed the transcripts and/or tapes of all hearings referenced in this opinion.
Transcripts can be obtained by either litigant through the ordinary procedures in the district.

2

denied most of Defendant's factual assertions by failing to explain why the proffered evidence is inadequate or objectionable. (*See, e.g.*, D.E. 75 at Pl. Resp. ¶¶ 25-36.) Instead, Mr. Oranika improperly responds in a narrative fashion to Defendant's numbered paragraphs in bulk form. Mr. Oranika also has failed to make any effort to organize and cite to his voluminous, duplicative, and often irrelevant filings, despite the specific and detailed requirements of the local rules. *See, e.g., Malec*, 191 F.R.D. at 583-84. In addition, much of Defendant's ream of unorganized materials consists of unauthenticated and otherwise inadmissible evidence, which is inappropriate as well. *See, e.g., Cichon v. Exelon Generation Co.*, 401 F.3d 803, 808 (7th Cir. 2005). Mr. Oranika also improperly tenders a rambling fifty-page "Narrative of Events" that is not presented or referenced through specific factual assertions, as the Local Rule 56.1 framework requires. *See, e.g., Midwest Imports*, 71 F.3d at 1313; *Malec*, 191 F.R.D. at 583-84. Likewise, many of Mr. Oranika's statements and assertions, even if they were taken without regard to the actual requirements by which they must be presented, are often deficient on their own terms.[3]

All of this is unacceptable, as expressly recognized by Seventh Circuit precedent. *See, e.g., Greer*, 267 F.3d at 727 (finding that such defects alone by non-movant would justify granting of well-supported summary judgment motion and stating, "a lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither

---

[3] For example, Mr. Oranika at times simply "denies" well-supported factual assertions of the City. (*See, e.g.*, D.E. 75 at 9 ("I deny the statement in paragraph 13 and 14 and demand strict proof thereof.").) This is unacceptable in the summary judgment context, where a litigant already has had the opportunity to complete discovery and to develop and assemble appropriate evidence (if any exists) to present a triable case. *See, e.g., Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir.2004) ("As we have often stated, summary judgment 'is the "put up or shut up" moment in a lawsuit, where a party must show what evidence it has that would convince a trier of fact to accept its version of events.'") (collecting cases and quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). In the absence of such evidence, summary judgment is appropriately granted against the non-movant if, as happened here, the movant's motion is well-grounded. *Koszola*, 385 F.3d at 1111 (collecting cases). Mr. Oranika also includes irrelevant assertions in his papers. (*See* D.E. 75 at 31 ("The great Chicago River had its course reversed. I have to presume the defendant applies the same scenario in the employment environment.").) This too is improper.

3

appellate nor district courts are obliged to scour the record looking for factual disputes.") (internal quotation marks and citation omitted); *Midwest Imports*, 71 F.3d at 1317. Where Defendant's factual assertions are properly supported by the record and not properly rebutted, the Court deems them correct for the purposes of this motion. *See id.; accord, e.g., Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).

As stated by District Judge Castillo, under the framework established by the local rules, "the penalty for failing to properly respond to a movant's 56.1(a) statement is usually summary judgement for the movant (at least if the movant has done his or her job correctly) because the movant's factual allegations are deemed admitted." *Malec*, 191 F.R.D. at 584. That is the outcome here. *Accord, e.g., Midwest Imports*, 71 F.3d at 1317. The Court enforces the local rules both because there is an independent interest in adhering to such rules and also because failure to do so would delay the adjudication of motions and cases involving litigants who have actually complied with the well-settled local rules that are designed to facilitate reasonably prompt adjudication of cases for everyone. *See, e.g., Midwest Imports*, 71 F.3d at 1316 (stating that it is a "reasonable judgment" that "strict, consistent, 'bright-line' enforcement is essential to obtaining compliance with the rule [concerning summary judgment adjudication] and to ensuring that long-run aggregate benefits in efficiency inure to district courts").[4]

---

[4] As a result of the above failures to comply with L.R. 56.1, the Court does not consider Mr. Oranika's improperly supported factual assertions. The recitation of facts below consists of those relevant statements of fact that the Court found properly supported by the record.

II.     Mr. Oranika's Employment With The City

Mr. Oranika is a black individual who was born in Nigeria in 1959. (D.E. 62 ¶ 1.) He came to America and began working for the City of Chicago's Department of Revenue ("DOR") in 1989. (*Id.* ¶¶ 1, 19.) William Cerney, Deputy Director of the DOR, interviewed Mr. Oranika and approved his hiring for an Auditor I position. (*Id.* ¶ 20) As an Auditor I, Mr. Oranika's job responsibilities included auditing businesses with tax obligations under immediate supervision. (*Id.* ¶ 21.) On October 15, 1991, Mr. Oranika was promoted to an Auditor II position. (*Id.* ¶ 22.) Gary Michals selected Mr. Oranika for the promotion and Mr. Cerney approved the promotion. (*Id.*) An Auditor II audits businesses with tax obligations under the guidance of senior level auditors or an audit supervisor. (*Id.* ¶ 23.)

A.     The City's Anti-Discrimination Policy

During Mr. Oranika's employment at the DOR, the City of Chicago had a Municipal Code in place that states, in part, that "[n]o person shall discriminate against any employee or applicant because of race, color . . . age, . . . [or] national origin." (*Id.* ¶ 11.) The Code also states that "[n]o person shall directly or indirectly discriminate against any individual in hiring, classification, grading, discharge, discipline, compensation or other terms or conditions of employment because of the individual's race, color, . . . age . . . [or] national origin." (*Id.*)

The Personnel Rules of the City of Chicago ("Personnel Rules") create a program of equal opportunity for employees and applicants that are consistent with the municipal code. (*Id.* ¶ 12.) The Personnel Rules set up a Discriminatory Charge Procedure through which employees can resolve complaints based on discrimination. (*Id.* ¶ 13.) At the time Plaintiff was hired in 1989, he received a copy of the Personnel Rules. (*Id.* ¶ 15.) Plaintiff never filed any discrimination or harassment complaints pursuant to these rules. (*Id.*)

B.	Disciplinary Actions

The Personnel Rules also outline the conduct that will be subject to disciplinary action, including discharge. (*Id.* ¶ 16.) Such conduct includes: (1) having an excessive absence or tardiness record; (2) failing to call in advance when tardy or not showing up for work; (3) failing to return to work on time after breaks, lunch, or rest periods; (4) falsely representing to a superior the quality and/or quantity of work performed; (5) discourteous treatment of another City employee or member of the public; (6) insubordination; (7) failing to complete an assignment; (8) inattention to duty; (9) incompetence or inefficiency in job performance; (10) violating departmental regulations, rules or procedures; and (11) conduct unbecoming a public employee. (*Id.* ¶ 16.)

Plaintiff had an extensive disciplinary history with the City spanning over many years. On June 28, 1991, Mr. Oranika was suspended for one day. (*Id.* ¶ 25.) The grounds for the suspension were insubordination, incompetence, inefficiency, failure to complete an assignment, and excessive hours spent on an assignment. (*Id.*) The suspension was initiated by Audit Supervisor Verna Curry, who is African-American. (*Id.*)

On August 1, 1991, Mr. Oranika was again suspended by Ms. Curry for one day. (*Id.* ¶ 26.) The basis for the suspension was failure to keep a scheduled appointment with a company. (*Id.*) On the suspension notice, Ms. Curry noted that Mr. Oranika had previously failed to keep scheduled appointments. (*Id.*)

On September 18, 1991, Mr. Oranika received a written reprimand, initiated by Ms. Curry. (*Id.* ¶ 27.) The reprimand was for incompetence and inefficiency because Plaintiff failed to recognize and address a company's failure to remit certain Chicago sales tax returns during an audit. (*Id.*) According to a notice filled out by Ms. Curry, Mr. Oranika had been working on this

6

file for eight days and had failed to address an issue that he should have addressed on the first day of field work with the file. (*Id.*)

On June 19, 2000, Mr. Oranika received a written reprimand from Iris Fojt, an Auditor IV. (*Id.* ¶ 28.) Mr. Oranika received the reprimand for tardiness and for an incident in which Mr. Oranika raised his voice towards Ms. Fojt when she met with him to discuss taxpayer complaints. (*Id.*)

On March 25, 2002, Sandy Mazzola, DOR Manager of Customer Service, issued Mr. Oranika a one-day suspension. (*Id.* ¶ 29.) The Suspension Notice was based on Mr. Oranika's inattention to duty, inability to complete assignments, and for inappropriately and inaccurately reporting the character of the work he performed. (*Id.*)

On April 9, 2002, Project Coordinator Tanya Moss-Buchanan issued Mr. Oranika a three-day suspension for failing to look for and process checks to satisfy claims in the Bankruptcy Unit. (*Id.* ¶ 30.) Mr. Oranika failed to complete the assignment and claimed he had searched for the checks. (*Id.*) Mr. Oranika's supervisor, however, was able to find those checks within two minutes. (*Id.*) Ms. Moss-Buchanan, who issued the suspension to Mr. Oranika, is African-American. (*Id.*)

On November 26, 2002, Mr. Oranika was suspended for five days. (*Id.* ¶ 31.) Eugenia Iskos, his supervisor, initiated this suspension for failing to complete assigned taxpayer overpayment notification cases, turning in work with multiple errors, spending excessive time on assignments, failing to follow instructions, and falsely reporting his time. (*Id.*)

On March 25, 2003, Ms. Iskos initiated another suspension of Mr. Oranika, this time for ten days. (*Id.* ¶ 32.) This suspension was triggered by an incident in which Mr. Oranika refused to assist a taxpayer in getting a status on her account and in getting information regarding a hold

on a business license. (*Id.*) In addition, Mr. Oranika refused to provide the name and telephone number of his supervisor despite multiple requests by the taxpayer. (*Id.*) Mr. Oranika also repeatedly interrupted the taxpayer and was condescending to her, prompting her to send a letter to the DOR complaining about Mr. Oranika's discourteous and unbecoming behavior. (*Id.*)

On May 16, 2003, Mr. Oranika received yet another suspension, this time for 15 days. (*Id.* ¶ 33.) Ms. Iskos initiated the suspension of Mr. Oranika because he failed to complete all of the taxpayer overpayment notification cases assigned to him. (*Id.*) Furthermore, the ones he turned in had multiple errors and were not done in accordance with instructions. (*Id.*) Mr. Oranika also took excessive time to perform assignments, failed to return to work on time after lunch and breaks on multiple occasions, and failed to call in advance when he was tardy. (*Id.*)

On June 25, 2003, Ms. Iskos initiated a 29-day suspension for Mr. Oranika's "threatening, abusive, intimidating, insubordinate and discourteous behavior" during meetings with his supervisor and managers. (*Id.* ¶ 34.) Ms. Iskos filed a Violence in the Workplace Incident Report and Robert Keller, the Coordinator of the City's Violence in the Workplace Program and an African-American individual, investigated the incident and sustained the complaint. (*Id.*) The Suspension Notice also reported Mr. Oranika's tardiness and failure to carry out directives from his supervisor. (*Id.*)

Throughout the time Mr. Oranika was an employee with the City, he was a member of the American Federation of State, County and Municipal Employees ("AFSCME"). (*Id.* ¶ 24.) The AFSCME had a collective bargaining agreement with the City which allowed employees to challenge disciplinary actions, including reprimands and suspensions, through a grievance process that culminated in arbitration. (*Id.*) The only disciplinary action that Mr. Oranika

challenged in the grievance process was his one day suspension on March 25, 2002. (*Id.* ¶¶ 35, 36.) The arbitrator reduced this suspension to an oral reprimand. (*Id.*)

       C.     Mr. Oranika's Performance Evaluations

DOR employees receive periodic performance evaluations. (*Id.* ¶ 37.) Employees are rated on a scale of 1-5. *Id.* A rating of 1 indicates "Unsatisfactory," 2- "Requires Improvement," 3- "Good," 4- "Very Good," and 5- "Outstanding." (*Id.*) Employees get rated concerning various individual job responsibilities, and they also receive an overall rating. (*Id.*) For each individual performance standard below a 3, a Performance Improvement Plan ("PIP") is required to correct performance deficiencies. (*Id.*)

In his 1990 performance evaluation, Mr. Oranika received an overall rating of 2.25, with 2s for performing audits in accordance with the DOR audit manual and for meeting deadlines. (*Id.* ¶ 38.) Verna Curry, Plaintiff's supervisor, wrote that he had "shown minimal ability in [his] ability to grasp new ideas, and needed guidance on routine instructions. [His] output for the past period is not consistent with what is expected." (*Id.*) Ms. Curry noted that Mr. Oranika's "performance for this rating period requires improvement," as his output during the period was unacceptable and the time he spent on assignments was excessive. (*Id.*) Ms. Curry further warned that Mr. Oranika's performance "must improve to the level of good or disciplinary action will be taken." (*Id.*)

In his 1991 performance evaluation, Mr. Oranika received a year-end overall rating of 1.5, with 1s for performing audits in accordance with the DOR audit manual and for meeting deadlines. (*Id.* ¶ 39.) Ms. Curry wrote that Mr. Oranika's "performance for this period is unsatisfactory and requires immediate improvement." (*Id.*) She stated that his files contained "unjustifiable audit hours," and further that he missed deadlines, manifested incompetence, and

had an unsatisfactory understanding of accounting systems. (*Id.*) Once again, a PIP was designed to correct Mr. Oranika's performance problems. (*Id.*)

The next evaluation in the record is from 1995. (*Id.* ¶ 40.) In this evaluation, Mr. Oranika received an overall rating of 2.6, with a 2 in multiple performance categories. (*Id.*) At this time Mr. Oranika's supervisor was Mr. Charles Brown, an African-American individual. (*Id.*) Mr. Brown wrote that he was disappointed with the number of audits Mr. Oranika completed during this period and the amount of time spent on each file. (*Id.*) Mr. Brown also cautioned that Mr. Oranika needed to improve in his interaction with taxpayers; Mr. Brown cited an incident in which a taxpayer convinced Mr. Oranika that he was due a tax credit, when that taxpayer actually should have received a substantial assessment. (*Id.*) Brown designed a PIP to improve Mr. Oranika's performance. (*Id.*)

In his 1998 performance evaluation,[5] Mr. Oranika received a year-end overall rating of 2.3, with a 1 for meeting the annual target of processing 150 refund claims and a 2 in five of the remaining eleven performance categories. (*Id.* ¶ 41.) Ms. Georgia Katsikonouris was Mr. Oranika's supervisor at the time. (*Id.*) She noted that Mr. Oranika needed to spend less time working on each file, that he failed to process a taxpayer protest, that his refund work papers were not clear and concise, that he completed an unsatisfactory number of files for the year, that he needed to improve his knowledge of tax laws, rulings, regulations and opinion letters, and

---

[5] Mr. Oranika attached what, reading things charitably to him, could be understood to be his performance reviews from 1996, 1997 and 1999, to his summary judgment response. However, these documents were not properly described or cited to in his 56.1(b)(3)(B) statement, as caselaw applying the Local Rule 56 framework instructs. Nor were they properly authenticated, and the City objects to the documents on such basis. *Accord, e.g., Cichon*, 401 F.3d at 808. Even if the Court were to disregard such threshold defects, the Court's review of these documents reveals that they would not have changed the outcome of this case because they do not appear to be significantly better than the evaluations submitted by the City. In addition, and independently, the fact that an employee may once have performed in a minimally adequate fashion, or as to certain functions of a job, does not mean that he cannot properly be fired or disciplined for other deficiencies or problems in other time periods. *See, e.g., Clay v. City of Chicago Dept. of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998).

that he should have been able to process more complex refund reviews as an Auditor II. (*Id.*) Ms. Katsikonouris designed a PIP to correct Mr. Oranika's performance problems. (*Id.*)

In his 2000 performance evaluation, Mr. Oranika received a year-end overall rating of 2.5, with a 1 for meeting the annual target of processing 150 refund claims and a 2 in five of the approximately thirteen remaining categories in which Mr. Oranika was rated. (*Id.* ¶ 42.) Mr. Oranika's supervisor at this time was Eugenia Iskos. (*Id.*) She noted that Mr. Oranika had tense relationships with some taxpayers, was negligent in preparing file workpapers, chronically failed to reach target completion goals, spent an excessive time on files, incorrectly reported the hours he worked on his files, and failed to follow DOR policies and procedures. (*Id.*) Ms. Iskos designed another PIP to correct Mr. Oranika's performance problems. (*Id.*)

In his 2002 performance evaluation, Mr. Oranika received an overall rating of 2.2, with a 2 in five of the six performance categories in which he was rated. (*Id.* ¶ 43) Brian Carlson, the Acting Supervisor of Compliance Analysis, stated that Mr. Oranika was rude to taxpayers and failed to return taxpayer messages, which led taxpayers to call and complain that Mr. Oranika was not very helpful. (*Id.*) Sandy Mazzola wrote that his production was deficient, he had not improved despite substantial instruction, he came late to work sixteen times, and once left the workplace without approval. (*Id.*) Audit Supervisor Eugenia Iskos found that the time Mr. Oranika spent on his files was excessive, his work contained many mistakes, he submitted time reports late and he repeatedly returned late from breaks and lunch. (*Id.*)

In his 2003 performance evaluation, Mr. Oranika received a mid-year overall rating of 2.0, with a 2 in each of the six performance categories. (*Id.* ¶ 44.) Ms. Iskos found that Mr. Oranika was, *inter alia*, spending too much time on his files, submitting work with many mistakes, failing to complete assignments as instructed, failing to process an adequate number of

files, and submitting incomplete time reports. (*Id.*) Ms. Iskos designed a PIP to correct Mr. Oranika's performance problems. (*Id.*)

      D.     Denial of Merit Increases

In 1991 and 1992, Audit Supervisor Verna Curry denied Mr. Oranika a pay increase because his performance fell below the level of 3 (good) in 1990 and 1991. (*Id.* ¶ 45.) In 2002 and 2003, Ms. Iskos denied Mr. Oranika pay increases because of his substandard job performance. (*Id.* ¶¶ 46-47.)

      E.     Denial of Promotion to Auditor III

An Auditor III works under general supervision, performing senior level auditing duties and working independently on moderate to complex assignments. (*Id.* ¶ 48.) Mr. Oranika applied for a promotion to Auditor III vacancies in June 2000, May 2002, and December 2002. (*Id.* ¶ 49.) He did not receive any of the promotions. (*Id.*) In April of 2003, Mr. Oranika once again applied for a promotion to Auditor III but was denied. (*Id.* ¶ 50.) This denial is being challenged in this action. (D.E. 1 at 14-16.)

In the April 2003 process, the DOR used the following criteria in assessing Auditor III candidates: (a) quality and relevance of previous job experience, including supervisory experience involving the exercise of independent judgment; (b) previous satisfactory performance in supervisory positions involving the exercise of independent judgment; (c) written communication skills sufficient to prepare audit reports; and (d) oral communication skills sufficient to communicate effectively with co-workers and supervisors. (*Id.* ¶ 57.) Gary Michals, the Manager of Tax Policy for the DOR, interviewed and rated each Auditor III candidate. (*Id.* ¶ 58.) To evaluate each candidate, Michals reviewed each candidate's performance evaluations and disciplinary histories and talked to their supervisors. (*Id.* ¶ 59.)

The candidate who was selected received a weighted average of 4, while Mr. Oranika received a 2.8. (*Id.* ¶¶ 61, 63.) A rating below 3 indicated that a candidate did not meet the requirements to be an Auditor III. (*Id.* ¶ 61.)

F.     Mr. Oranika's Discharge

On July 15, 2003, following Mr. Oranika's return to work after his 29 day suspension, Ms. Iskos assigned him five cigarette tax refund claims. (*Id.* ¶ 64.) A cigarette tax refund is made when a cigarette wholesaler has spoiled, stale, or otherwise unmarketable cigarettes. (*Id.*) The wholesaler sends the cigarettes back to the manufacturer for credit and the manufacturer sends back an affidavit identifying the number of cigarette packages that have been returned. (*Id.*) The wholesaler then sends this affidavit along with other documents to the City for a refund of the tax collected on those cigarettes. (*Id.*) The record reflects that cigarette tax refunds are simple and routine work for auditors at all levels. (*Id.* ¶ 65.) Mr. Oranika had worked on cigarette tax refunds in 2000 under a different supervisor, and the method of processing these claims had not changed. (*Id.* ¶ 66.)

On July 25, 2003, Ms. Iskos met with Mr. Oranika for an hour reviewing the process he needed to follow on the cigarette tax refunds. (*Id.* ¶ 67.) Ms. Iskos undertook this review because Mr. Oranika had not successfully completed prior assignments and she wanted to give him additional guidance to avoid problems on the cigarette tax refund cases. (*Id.* ¶ 68.) These cigarette cases were Mr. Oranika's only assignments at the time. (*Id.* ¶ 69.)

A week and a half later, on August 6, Mr. Oranika turned in one of the five case files to Ms. Iskos. (*Id.* ¶ 70.) In Ms. Iskos' experience, an auditor should have been able to complete a case file such as this in approximately one day. (*Id.*) Ms. Iskos determined that the work on the one file contained multiple errors, used incorrect formats, omitted necessary documents, and was

13

not organized according to her instructions. (*Id.* ¶ 71.) Ms. Iskos advised Mr. Oranika of these deficiencies with a "multi-page point clearance sheet." (*Id.*) When Mr. Oranika resubmitted the case file, Ms. Iskos found that it still had multiple errors that she had previously identified. (*Id.* ¶ 72.)

On August 7, Mr. Oranika submitted a second case file—again with the same types of errors he made in the first file. (*Id.* ¶ 73.) Ms. Iskos again prepared a multi-page point clearance sheet. (*Id.*) Mr. Oranika also completed a few but not all the documents for the third case file, and he took 8.5 hours to do so. (*Id.* ¶ 74.) In Ms. Iskos's experience, the work that Mr. Oranika took 8.5 hours to do should have been completed in ten minutes. (*Id.*) Mr. Oranika did not turn in any work on the fourth or fifth case files. (*Id.* ¶ 75.)

Ms. Iskos also did an analysis comparing how long it took Mr. Oranika to complete a cigarette tax refund affidavit against the time it took a probationary Auditor I and a college intern. (*Id.* ¶ 76.) She found that it took Mr. Oranika approximately eight times longer to complete one affidavit compared to the probationary Auditor I and the college intern. (*Id.*) The college intern and Auditor I also made few, if any, errors, and therefore no point clearance was required. (*Id.*)

In November of 2003, Bea Reyna-Hickey, the Director of DOR, made the decision to discharge Mr. Oranika. (*Id.* ¶ 77.) She made the decision after reviewing a memo outlining Mr. Oranika's recent work on the cigarette tax refund cases, Ms. Iskos's comparison analysis with the college intern and the Auditor I, and Mr. Oranika's disciplinary history, including his progressive suspensions. (*Id.*)

Mr. Oranika requested a hearing on his discharge before the City's Personnel Board. (*Id.* ¶ 78.) The case was heard by a hearing officer, at which time Mr. Oranika had the opportunity

14

to present evidence, testify under oath, and cross-examine witnesses under oath. (*Id.*) On December 13, 2005, in agreement with the recommendation of the hearing officer, the Personnel Board found that the City had proved by a preponderance of the evidence that Mr. Oranika violated the Personnel Rules, and the Personnel Board upheld his discharge. (*Id.*)

G.  Mr. Oranika's Action Against the City

On or about July 7, 2003, Mr. Oranika filed a charge ("the EEOC Charge") with the Equal Employment Opportunity Commission ("EEOC"), asserting the following acts of alleged discrimination by the City: denial of a merit pay increase, imposition of work suspensions, failure to promote, harassment, and denial of overtime. (D.E. 1 at 8-23.) In the EEOC Charge, Mr. Oranika stated that the bases for these discriminatory acts were: his national origin (Nigerian) (*e.g.*, *id.* at 8, 10); his age, 43 (*e.g.*, *id.* at 9, 11-13); and his filing of prior EEOC charges (*e.g.*, *id.* at 9, 11). The EEOC issued a right-to-sue letter on September 21, 2004. (*Id.* at 3, 6-7.)

Subsequently, Mr. Oranika filed a complaint ("Complaint") in this Court, alleging the following acts of discrimination by the City: termination of employment, failure to promote, failure to stop harassment, and retaliation. (*Id.* at 3-4.) The Complaint listed the following bases for those discriminatory acts: age, national origin, color, and race. (*Id.* at 3.) The Complaint included a claim for, among other relief, ten million dollars in punitive damages against the City. (*Id.* at 5.)

In an order filed on October 17, 2005, this Court dismissed the Department of Revenue as a defendant and granted the City's motion to dismiss the claims for punitive damages. (D.E. 42 at 10.) The Court granted the City's motion to dismiss the claims for discriminatory discharge under Title VII and the ADEA because Mr. Oranika had not raised the issue or any

reasonably related issue in his EEOC charge. *Id.* The Court also granted the City's motion to dismiss the §1981 and § 1983 claims since Mr. Oranika failed to allege that his injuries were caused by an unconstitutional municipal policy, practice, or custom. (*Id.* at 9.)

Mr. Oranika subsequently filed an amended pleading—*i.e.*, a "Notice of Amendment to Case Number 04C8113." (D.E. 49.) The amended pleading included allegations that his injuries were caused by an unconstitutional municipal policy or custom. (*Id.* at 4; *see also* Note 8, *infra.*) He also attached his EEOC filing for discriminatory discharge that was not included in the first complaint. (*Id.* at 12-13.) The City did not move to dismiss this complaint but rather moved for summary judgment on all of Mr. Oranika's claims. (D.E. 60.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). The Court views the properly-presented record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

16

## DISCUSSION

I.     Mr. Oranika's Title VII, ADEA and §1981 Claims

Under 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." Title VII of the Civil Rights Act states that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims brought under Title VII and § 1981 are analyzed in the same manner. *See, e.g., Patton v. Indianapolis Public School Bd.*, 276 F.3d 334, 338 (7th Cir. 2002); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998). The ADEA, which similarly prohibits discrimination against individuals based on age, *see* 29 U.S.C. § 623(a)(1), is also analyzed in the same way as Title VII for the purposes of this motion to the extent ADEA claims remain. *See, e.g., Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir. 1996).

A.     Mr. Oranika's Claims of Wrongful Discharge and Failure to Promote

Mr. Oranika can prove employment discrimination using the direct or indirect method. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004). To establish discrimination under the direct method of proof, "a plaintiff must show either an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

Caselaw establishes that direct proof of discrimination is relatively difficult to adduce. In this regard, the Seventh Circuit has defined direct evidence in the employment law context as evidence which, if believed by the trier of fact, will prove the particular issue in question without

reliance on inference or presumption. *See, e.g., Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir.2003) (citations omitted). The Seventh Circuit has repeatedly counseled that "[d]irect evidence usually requires an admission by the decisionmaker that his actions were based on" the illicit decision-making criterion. *Balderson v. Fairbanks More Engine Div. of Coltec Indus.,* 328 F.3d 309, 321 (7th Cir.2003); *see also Rogers,* 320 F.3d at 753 (stating that direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.") (internal quotation marks and citation omitted). The Seventh Circuit has explained that evidence of this sort is exemplified by statements such as "'I fired you because of your age'" or because of another illicit decision-making criterion. *Robin v. Expo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir.2000) (citation omitted); *accord, e.g., Castleman v. ACME Boot Co.,* 959 F.2d 1417, 1420 (7th Cir. 1992) (teaching that direct evidence will "rarely" be found). Mr. Oranika offers no direct evidence of discrimination, nor does he assert that he can present a triable case under the direct method of proof.

Instead, Mr. Oranika appears to be relying on the indirect method of proof. To establish a prima facie case under the indirect method of proof, Mr. Oranika must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) the employer took an adverse employment action against him; and (4) his employer treated similarly situated individuals outside of the protected class more favorably. *See, e.g., Herron,* 388 F.3d at 299. In this regard, the Seventh Circuit has "frequently warned litigations that the prima facie case must be established and not merely incanted." *See, e.g., id.* at 300 (internal quotation marks and citation omitted). If Mr. Oranika meets the burden of establishing a prima facie case of discrimination, then Defendant must articulate a legitimate, nondiscriminatory reason for its actions. *See, e.g., id.* at 299 (citation omitted). If the City puts forth such a reason, Mr. Oranika

must present a triable issue concerning whether the justification put forth was really a pretext for discrimination. *See, e.g., id.* A non-pretextual reason is not a reason that would have motivated the Court to take a similar action if it were the hypothetical personnel manager of the employer at issue: instead, a pretext is "a dishonest explanation, a lie rather than an oddity or an error." *See, e.g., id.* (collecting cases; internal quotation marks and citation omitted); *see also Castleman v. ACME Boot Co.*, 959 F.2d at 1421 (discussing relevant inquiry).

Mr. Oranika has failed to present a prima facie case of employment discrimination because he has failed to satisfy the second requirement. Mr. Oranika bears the burden of showing he was meeting his employer's legitimate expectations. *See, e.g., Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). "Legitimate" expectations means "bona fide" expectations. *Id.* The City has put forth an overwhelming amount of evidence to show that Mr. Oranika was not meeting legitimate expectations. Mr. Oranika's repeated disciplinary problems and poor performance evaluations are well documented by the City, and he has failed to adduce any evidence consistent with the Local Rule 56.1 framework rebutting such proof.

In this regard, the Court notes that the fact that Mr. Oranika may have received a rating of 3 on some components of his generally poor evaluations does not negate the many areas in which the City found his performance deficient. *See Clay v. City of Chicago Dept. of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998) ("The fact that at one point [the employee] received a 'good' rating does not help her because uncontradicted evidence is replete that her performance was extremely flawed. Proof that plaintiff was once considered an adequate employee before her discharge does not suggest that defendant's explanation for her discharge [*i.e.*, poor performance] was in violation of" federal employment laws). Moreover, Mr. Oranika cannot forestall summary judgment by his personal assertions that, for example: "Reflecting back, I was

19

a good employee." (D.E. 75 at 23; *see also id.* at 18 ("I never spent an excessive time on an assignment because when a case file is issued no one knows how many hours the file will take before it is closed"); *id.* (Mr. Oranika denying that he was ever "inefficient" or "incompetent").) These assertions were not properly presented under Local Rule 56.1 and therefore are not appropriately considered. Moreover, even if one were to excuse this fundamental threshold defect (and the Court does not do so), they are still insufficient to forestall a grant of summary judgment. *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (teaching that an employee cannot create a triable case of alleged discrimination simply by disagreeing with his employer about whether he was performing well) (collecting cases). In this regard, the Seventh Circuit has instructed repeatedly that arguing about whether a company or public employer was correct or not concerning an honestly held basis for an employee's firing is "a distraction." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 900 (7th Cir. 1999); *accord, e.g., Kariotis v. Navistar Int'l Transportation Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (citation omitted). Mr. Oranika's may actually believe that "[r]eflecting back, I was a good employee," but such a contention does not create a triable issue concerning whether the City was lying when it concluded—based on the assessments of a diverse group of many supervisors and citizen complaints—that he was, in fact, a decidedly poor employee.

The Court further notes that Mr. Oranika only once took advantage of the City's grievance procedure to challenge disciplinary actions and performance evaluations.[6] If the grounds for Mr. Oranika's suspensions and poor performance evaluations were indeed fabricated, one would expect to see evidence that Mr. Oranika challenged these actions at the time they happened. *See Peele v. Country Mut. Ins.*, 288 F.3d 319, 327 (7th Cir.2002) (noting

---

[6] Mr. Oranika includes copies of e-mails he sent to his supervisors that dispute his performance evaluations, but these e-mails are not part of the City's grievance procedure. Furthermore, these documents were not cited as exhibits in Mr. Oranika's Rule 56.1(b) statement.

that repeated verbal and written warnings that plaintiff's performance was unacceptable were never challenged).

The Court further notes that even if Mr. Oranika's record on paper comes across as worse than it actually was, Mr. Oranika would not be able to show he was meeting legitimate expectations even if his record was only half as bad. In *Herron*, for example, the plaintiff had been subject to repeated disciplinary actions for his "persistent, significant problems with his treatment of co-workers, superiors and subordinates." 388 F.3d at 297. Despite his disciplinary problems, Herron demonstrated a "pattern of solid production work." *Id.* at 298. The court found that Herron's disciplinary history was enough to demonstrate that he was not meeting his employer's legitimate expectations. *Id.* at 300. In this case, the City has even stronger evidence against Mr. Oranika. Not only was he disciplined for his behavior at work, but he continuously failed to meet the level of production expected of him. Although he was promoted once to Auditor II some fifteen years ago, Mr. Oranika must provide evidence that he was performing well at the time the City fired him. *See, e.g., Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993) (collecting cases); *see also Richardson v. Pepsi-Cola General Bottlers, Inc.*, 282 F. Supp. 2d 855, 863-64 (N.D. Ill. 2003) (Guzman, J.) (plaintiff with repeated unexcused absences and discipline problems failed to show satisfactory job performance despite evidence her supervisor considered her work to be "good overall"). The City properly provides evidence that Mr. Oranika was failing to complete cigarette tax refunds in a timely or thorough manner despite quite generous guidance from Ms. Iskos, and "it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers." *Coco*, 128 F.3d at 1179. Furthermore, Ms. Iskos's report showing that a college intern was completing cigarette tax refunds at eight times the speed of Mr. Oranika is certainly a legitimate reason to

21

view Mr. Oranika as an inadequate employee, and he has presented nothing to question the sincerity of this determination. (D.E. 62 ¶ 76.) Accordingly, summary judgment is warranted for his failure to meet his employer's bona fide performance demands.

In addition, and independently, Mr. Oranika has failed to show that any similarly situated employees were treated more favorably. To make this showing, Mr. Oranika has the burden to show that there is "someone who is directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (collecting cases). Mr. Oranika has provided no evidence within the Rule 56.1 framework that other employees who had exhibited the same level of performance were treated more favorably, or that some less (or even equally) qualified person received a promotion that should have been Mr. Oranika's.[7] *See Herron*, 388 F.3d at 300-01.

B.      Mr. Oranika's Retaliation Claim

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing in this subchapter." 42 U.S.C. § 2000e-3(a); *see also* 29 U.S.C. § 623(d). In his Complaint,[8] Mr. Oranika references

---

[7] In his Complaint, Mr. Oranika names other employees as similarly situated who received merit increases and promotions that he was denied. (D.E. 1 at 9, 15.) However, he fails to put forth evidence to establish any comparators in conformity with Local Rule 56.1. In Defendant's answer to Mr. Oranika's complaint, the City denied that the named employees were similarly situated. (D.E. 53 at 5, 12.)

[8] It is well settled in the law that when a plaintiff files an amended complaint, a prior complaint or complaints are superseded and the operative allegations are only those contained in the last amended pleading. *See, e.g.*, *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) (stating that "[a]n amended pleading ordinarily supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading and become functus officio.") (internal quotation marks and citation omitted). On November 15, 2005, this Court denied Mr. Oranika's motion to reopen discovery, and it also denied in substantial part and granted in small part a motion to amend the complaint. (*See* Hearing Transcript of November 15, 2005.) The amended pleading, as permitted, only included a barebones *Monell* allegation. (D.E. 49 at 4-5.) Under *188 LLC*, the final pleading does not even include any meaningful averments concerning retaliation. *See id.*, 300 F.3d at 736. However, even

22

alleged retaliation based on actions that occurred subsequent to his first EEOC complaint in November of 2000. (*See* D.E. 1 at 9, 11, 13, 15, 17, 23.)

As explained before, Mr. Oranika adduces no evidence as required by the Local Rule 56.1 framework to support such a claim. For this reason alone, the claims are subject to summary judgment in response to the City's well-presented and supported summary judgment motion. *Accord, e.g., Midwest Imports*, 71 F.3d at 1316-17.

Moreover, and independently, even if the allegations in the Complaint were credited without regard to the requirements of Local Rule 56.1, the claim still would properly be dismissed. To establish a claim of retaliation under the indirect method (no direct evidence is even suggested), Mr. Oranika must show that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). For the same reasons stated above, Mr. Oranika has failed to show that he was performing his job in a satisfactory manner. There is unrebutted evidence of Mr. Oranika's inadequate job performance after November of 2000. In order to prove discrimination or retaliation, Mr. Oranika must present evidence beyond his own personal assessment that he was doing good work and that he actually was a good employee. *See, e.g., Adusumilli*, 164 F.3d at 363 (collecting cases). Moreover, as previously mentioned, the Seventh Circuit has counseled many times that arguing about whether an employer was correct or not concerning an honestly held basis for a personnel decision is "a distraction." *Green*, 197 F.3d at 900; *accord, e.g.*,

if one entirely ignores this issue (to Mr. Oranika's benefit) and looks at the allegations in the original Complaint as well, the allegations provided do not even suggest a colorable or triable retaliation case.

23

*Kariotis*, 131 F.3d at 677. Thus, for example, an employer is entitled to credit citizens' complaints that Mr. Oranika was rude and unprofessional (*see* D.E. 62 ¶¶ 32, 43), and to act upon such assessments, without being subject to a federal jury trial to determine if Mr. Oranika really was not rude and unprofessional to those citizens. Put differently, as the Seventh Circuit has stated, "[n]either the jury nor this court is empowered to act as a 'super-personnel department' and decide if [an employer's employment decision] was unwise or unjustified." *Castleman v. ACME Boot Co.*, 959 F.2d at 1422 (citation omitted); *accord, e.g., Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1220 (7th Cir. 1991) (holding that an employer's practices, including its hiring and firing practices can, for better or worse, be "medieval," "high-handed," or "mistaken" so long as they are not based on discriminatory reasons), *overruled in part on other grounds by Oxman v. WLS-TV*, 12 F.3d 652 (7th Cir. 1993). Similarly, precedent teaches that the one-page bareboncs affidavit Mr. Oranika provides from a union representative,[9] in which the representative says that Mr. Oranika did not "deserve" to be "treated the way he was" does not create a triable issue concerning the City's assessment (one shared by the hearing officer and Personnel Board) that Mr. Oranika was violating City rules and performing inadequately. *See, e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (collecting cases and stating that, "[o]ur cases . . . give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance") (internal quotation marks and citation omitted). Moreover, the union representative does not suggest even that Mr. Oranika was performing well, or that the City's criticisms were wrong, much less that they were not actually believed and instead are part of a multi-person conspiracy to discriminate against Mr. Oranika. Again, nothing in the record

---

[9] This affidavit is not provided or presented properly as required by Local Rule 56.1. As a result, it is not appropriately considered. Even if one were to ignore this defect, however, to Mr. Oranika's benefit, the affidavit would not alter the result herein.

suggests that the City is lying about its belief—the product of conclusions of numerous individuals, of diverse backgrounds, assembled over a period of years—that Mr. Oranika was not performing at acceptable levels and therefore merited firing or other disciplinary actions as opposed to getting a promotion.

In addition, and independently, the Court notes that the time gaps between the protected activity and the putatively retaliatory actions (in this case, over 9 months in the shortest instance (*see* D.E. 1 at 9-10) and even more months or years in others (*see, e.g., id.* at 13-14 (thirteen month and 30 month gap between protected activity and putative "retaliation")) militates against any triable case of retaliation. *See, e.g., Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (one year gap too remote to infer causation); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (four month delay was "counter-evidence" of causal inference). Mr. Oranika has failed to present a triable case of retaliation for multiple, independent reasons, but this reason (the remoteness of time negating a triable causation case on the record otherwise assembled) confirms the propriety of dismissal of this claim.

C.      Hostile Work Environment

Mr. Oranika also attempts to base Title VII liability on putative workplace harassment in violation of federal law. (D.E. 1 ¶ 12.) To prove a hostile work environment as a basis for Title VII liability, Mr. Oranika must show that "'(1) he was subject to unwelcome harassment; (2) the harassment was based on his . . . [protected status]; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for

employer liability.'" *Herron*, 388 F.3d at 302 (citing *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004)).

Again, Mr. Oranika does not adduce any evidence of harassment within the framework established by Local Rule 56.1 and caselaw applying it. As a result, this claim is subject to summary judgment in response to the City's well-presented summary judgment motion. *Accord, e.g., Malec*, 191 F.R.D. at 584-85 (explaining that a non-movant's failure to comply with Local Rule 56.1 requirements typically results in summary judgment in the movant's favor).

In addition, even if one were to disregard Local Rule 56.1 (and the Court will not do so, but merely will point out this issue because it alternatively would warrant summary judgment in any event), the putative harassment Mr. Oranika references in his Complaint[10] would not constitute actionable harassment under the law. This putative harassment allegedly occurred between March and May of 2003. (D.E. 1 at 18-20.) Mr. Oranika alleged that Mr. William Cerney (the Deputy Director of the City Department of Revenue (D.E. 62 ¶ 20)) called him into his office to "verbally berate me for no reason" and "threatened to have me discharged and reassigned to another section within the department of revenue." (*Id.* at 19-20.) He further alleged that Ms. Iskos, *inter alia*, "constantly monitors my whereabouts within the Revenue Department," "would remove my personal belongings from my desk without proper permission," and "would take her time approving time I requested off." (*Id.*)

Such allegations, even if credited, do not rise to the level of actionable "severe or pervasive" harassment under the law. *Whittaker*, 424 F.3d at 645. Under federal precedent, the alleged harassment must create "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *see also Whittaker*, 424 F.3d

---

[10] *See also* Note 8, *supra*.

at 645 ("the alleged harassment must be 'both subjectively and objectively so severe or pervasive as to alter the conditions of . . . employment and create an abusive working environment.'") (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004)). The behavior Mr. Oranika points to would fall under the category of "normal workplace friction," which is not actionable under Title VII. *Herron*, 388 F.3d at 303 (plaintiff's allegations about "transfers, a late overtime payment, his salary, and difficulties with managers" constituted neither severe nor pervasive harassment); *Robinson v. Kim*, No. 04 C 3678, 2005 WL 326985, at *6 (N.D. Ill. Feb. 8, 2005) (complaint that supervisors harassed plaintiff about his work schedule, attendance and performance did not constitute severe or pervasive harassment). As the Seventh Circuit has often stated, "[t]he workplace that is actionable is the one that is hellish." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003) (citation omitted); *accord, e.g., Baskerville v. Culligan Int't Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (articulating same standard). Even if one were to credit Mr. Oranika's contentions, they do not reach or approach the level of harassment required under the law. *Accord, e.g., Herron*, 388 F.3d at 303.

In addition, and independently, Mr. Oranika's harassment claim fails because he has not produced any triable case concerning the requisite connection between the complained-of actions and any of his protected statuses (*i.e.*, his race, color, national origin, or age). *See, e.g., id.* at 302. "While it is true that harassment need not be *explicitly* racial [or ageist, *etc.*] in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial [or aged-based, *etc.*] minority." *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) (emphasis in original, citation omitted). The City has properly put forth evidence that demonstrates that any allegedly "harassing" behavior actually

related to multiple supervisors' efforts to correct Mr. Oranika's poor workplace performance and conduct. *See, e.g., Beamon*, 411 F.3d at 864 ("There is no inherently racial component to an employer providing an employee with a critical (even an unfairly critical) performance review . . ."). Mr. Cerney and Ms. Iskos—the two later supervisors complained of—were certainly not the first supervisors to find Mr. Oranika's performance and behavior wanting. Verna Curry, Sandy Mazzola, Tanya Moss-Buchanan, Charles Brown, Georgia Katsikonouris, Maureen McInerney, Brian Carlson, and Bea Reyna-Hickey (a substantial number of whom are themselves members of one or several protected groups under the law, including groups in which Mr. Oranika is also a member) as well as the hearing officer and Personnel Board all found deficiencies in Mr. Oranika's behavior and/or performance. *See, e.g., Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (given employee's repeated problems with different managers, "it is not possible to conclude that [a supervisor's displeasure] had something to do with discriminatory motives").[11] Simply put, Mr. Oranika has put forth no evidence to show (or reason to believe) that Mr. Cerney and Ms. Iskos were singling him out because of his race, color, national origin, or age. *See, e.g., Patton*, 276 F.3d at 339 (rejecting hostile workplace claim and noting that Title VII "does not guarantee a utopian workplace, or even an pleasant one" and that "[a]s long as hostility was not based on a protected characteristic, Title VII is not implicated") (internal quotation marks and citation omitted).

---

[11] The Court does not understand the Seventh Circuit in *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998), to suggest that an individual never could be discriminated against by a supervisor on the basis of a characteristic that the two individuals share, as there are certainly self-hating bigots in the world. Nonetheless, in this case, a plethora of people, of diverse backgrounds, found that Mr. Oranika was a deficient worker in numerous, substantial respects over an extended period of time. There is no evidence whatsoever that their criticism of him (or his eventual termination) had anything whatsoever to do with his age or race or ethnicity. Put differently, on the basis of the properly-assembled record, no reasonable jury could find that discriminatory harassment occurred; and no reasonable jury could find that Mr. Oranika was fired for reasons other than the employer's sincere belief that Mr. Oranika's performance levels were deficient—indeed, below those of a college intern and entry-level employee.

II. Mr. Oranika's § 1983 Claim

Mr. Oranika's amended pleading also suggested liability under 42 U.S.C. § 1983.[12] To set out a prima facie case in a Section 1983 action, Mr. Oranika must show a triable case that "(1) defendants acted under color of state law, (2) defendants' actions deprived plaintiff of h[is] rights, privileges, or immunities guaranteed by the Constitution, and (3) defendants' conduct proximately caused plaintiff's deprivation." *Limes-Miller v. City of Chicago*, 773 F. Supp. 1130, 1135 (N.D. Ill. 1991) (Shadur, J.) (citing *Webb v. City of Chester, Ill.*, 813 F.2d 824, 828 (7th Cir. 1987)). In addition, a claimant needs to prove that the defendant acted with discriminatory intent. *See, e.g., Webb*, 813 F.2d at 828 (citation omitted). "[M]unicipalities cannot be held liable for [their employees' actions] in § 1983 claims under a theory of *respondeat superior*." *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1999); *accord, e.g., Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978). Rather, "the municipality is only responsible for its employees' actions if taken pursuant to an unconstitutional policy or custom of the municipality itself." *Garrison*, 165 F.3d at 571 (citing *Monell*, 436 U.S. at 690).[13] Aside from some cursory allegations in the amended pleading that are not borne out by the record, (D.E. 49 at 4-5), Mr. Oranika has failed to adduce anything suggesting such an unconstitutional policy or custom. The only relevant evidence regarding the City's policy in the record is the City's Personnel Rules which specifically prohibit such unconstitutional behavior. (D.E. 62 ¶¶ 11-12.) *See Limes-Miller*, 773 F. Supp. at 1136. Mr. Oranika has not established a pattern, practice, or custom because he has not produced evidence that the City acted in an unconstitutional manner even as to him alone, let alone in an illicit manner that is a persistent

---

[12] *See* Note 8, *supra.*

[13] The same analysis applies to Mr. Oranika's § 1981 claim, which has previously been resolved. *See McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

29

and widespread practice. Accordingly, his Section 1983 claim against the City fails. *Accord*, *e.g.*, *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986).

III.    Final Matters

The Court's experience with Mr. Oranika, as the Court stated at various status hearings, is that he was remiss in meeting deadlines and in otherwise attending to generic responsibilities for which all litigants are held accountable. (*See, e.g.*, D.E. 21, 30, 31, 46, Hearing Transcript of November 15, 2005, Hearing Transcript of August 24, 2006.) During the course of this case, the City variously sought to sanction Mr. Oranika for these inadequacies—which requests were denied, except insofar as various substantial inadequacies led to the denial of certain motions, such as, for example, a motion by Mr. Oranika to belatedly reopen discovery. In retrospect, it is a fair question whether this Court should have more aggressively called Mr. Oranika to account for his lack of diligence and responsibility, as his behavior persisted over time and certainly impeded both the progress of the case and imposed certain unwarranted burdens on the City. In any event, the Court attempted to be extremely solicitous of Mr. Oranika, particularly given his *pro se* status, as the Court generally does with all litigants.

In the interests of completeness, the Court is compelled to address one of the issues Mr. Oranika variously raised in this regard, in the event it were ever germane in a different forum. Specifically, Mr. Oranika asserted that he suffered from certain medical (dental) problems during the course of the case, and the Court will accept his representations in this regard. The Court will also accept that, in connection with these problems, Mr. Oranika variously took both, as he described them, "acetaminophen" (more commonly referred to in the public domain as Tylenol) and "ibuprofen" (more commonly referred to in the public domain as Motrin or Advil). (*See* Hearing Transcripts of June 27, 2006, and Hearing Transcript of August 24, 2006.)

However, there was no showing whatsoever that the ingestion of these routine pain-killers impeded Mr. Oranika's ability to prosecute his case, or that they impaired him in any other meaningful way. Mr. Oranika (when he came to Court) was always lucid and could speak—clearly, cogently, and at length—for himself. He sought and received extraordinary long extensions of time to complete his summary judgment response, which was not filed until approximately five and one-half months after the City filed its materials. In addition, Mr. Oranika is a very well educated man (he has both bachelor's and master's degrees) and he has much greater "real world" experience and worldliness than the vast bulk of *pro se* litigants who routinely are expected to (and do) litigate their own cases in this courthouse.[14] Finally, in this regard, the Court notes that Mr. Oranika had substantial problems adhering to deadlines and fulfilling basic litigation responsibilities well before he started taking ibuprofen and acetaminophen.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment concerning Mr. Oranika's action is granted.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 1/3/07

---

[14] In connection with the City's summary judgment motion, the City provided Mr. Oranika with specific written guidance about his responsibilities under Local Rule 56.1 concerning summary judgment adjudication. (See D.E. 63.) Prior to the City's motion, the Court also had specifically advised Mr. Oranika in open court that there were rules about how summary judgment filings needed to be prepared, that there were filings prepared by the Clerk's Office to assist pro se litigants in that regard, and that Mr. Oranika should read such rules carefully. (See Hearing Transcript of November 15, 2005.)

31